We don't disagree that violence against Christians has been going on for years in Indonesia. However, that misses the point. The question is not whether there has been this type of violence before, but whether the new violence is qualitatively different. I have the same question in this case that I had in the prior case, which is what is the showing that's comparable in this case to the showing in Salim as to individualized risk? Because we have the parents' letter here, but it doesn't describe the kinds of individualized fears and history that's described in the sister's letter in Salim. Well, again, Your Honor, we're not depending on mere membership. We are showing that Mr. Theodore was specifically targeted in the past for being a member of these two disfavored groups or doubly persecuted groups, if you will. When he was last before the judge, he recounted, and the judge found them credible, six different instances of harms, four times where he was beaten and had racial slurs thrust upon him. One time when he was sitting in a car and he saw his father running out of a building with a cut on his head and a man yielding a machete running after him. And another incident when he was in church and there was a bomb threat. I mean, these are things that have happened to him that can show or provide the reference for future persecution. Also, a hoax case is similarly important here because I believe the parents' letter stated that, you know, one of the fears of don't come back is that the new governor had said, quote unquote, this is a Muslim country in effect, taking battle. So, am I correct that under your kind of analysis of this, anyone who testifies, so say they're Chinese Christians from Indonesia, they testify that conditions changed between 2006 and 2013 or whatever it is, in this case, 2011 and 18. And they say, I faced something pre-leaving the country and coming to America, pre that period, that's always enough? Well, your honor, you're looking at, you know, when you go back to Sayal, and Sayal establishes the disfavored group, it says, you look to the country conditions. The worse the country conditions are, the less of an individualized showing that you need to provide, right? So, in a post, I'm sorry to interrupt you, counsel, but in a post-Saleem world, is your argument that you need to provide very little now in order to meet the changed conditions? Because the situation now is far worse than it's ever been. You have not only private actors, but you also have the government partaking in the persecution. And it was, whereas in the past, it was the government was just allowing these things to happen or they were either unable or unwilling. Now, the government has a hands-on approach. So, the level of individualized risk can be qualitatively less than before. So, in that regards, yes, your honor. Your honor, there's also one other argument that, you know, other than the argument that the government normally makes that, you know, it was bad then, it's bad now, you can't differentiate the two. Where I think we've shown it both in Saleem and post-Saleem in this case. And in fact, with Raboah, one of the cases that the government had cited in their briefs of where when I presented oral arguments to the panel, we didn't have the benefit of Saleem. And Raboah turned around and he filed a new motion to reopen on substantially the same evidence that's before the court now. And the board granted Raboah's case. But this argument that the government makes in their briefs, it's rather bizarre. On page 21 of their brief, they say, you know, the death toll is not that big. So, really, not an issue here. And I don't understand that argument. When a church is blown up and people are inside the church who lose their lives, does it matter? Does the death toll really matter? And if so, you know, I'd like to know, what is their bright line test? You know, how much death is required before the government would constitute or would agree that there has been a change in country conditions? Aren't they? I mean, aren't they really trying to say that the difference between religious intolerance and violence is religious intolerance slash violence is different per se than persecution? I mean, isn't that what the government's trying to do is draw a line between the two? Look, Your Honor, there's one thing to say that there's religious intolerance. But when the government itself is sending the record, you know, the BIA tries to distinguish here, right? They're saying that this is a high profile case, but it's always these high profile cases that send a direct message to the majority or to the people who are the oppressors that say, look, we're with you. You know, so is it is it enough in your estimation if one church gets bombed as horrific as that is, is that enough to meet the threshold? You look at it at everything that's going on, Your Honor. I don't ever I would never just say one as horrible as that is. But I'm not ready to concede that point. You know, it's you're looking at a totality of circumstances and with everything else when you have a church that's blown up or when you know, again, this goes to future fear of harm, right? While this case was pending, you have the three suicide bombers detonating three churches at the same time in Indonesia. I mean, the government can't say in one respect, oh, no, nothing's happening. And in the other respect, okay, well, it just happened once or twice. And yeah, they haven't met their threshold. I would argue that they have that we have. I have a question. Yes. Doesn't the discretion of the BIA allow it to determine in this case that there's been no qualitative change in the persecution? Because there hasn't been any. And I mean, there is enough comparison between the situation that there is now and there was before. Is it is it totally rational for the BIA to say the qualitatively situation hasn't changed? Well, your Honor, again, yes. So it is abuse of discretion. And where we're showing is it's not the type of violence, but it's the intensity, the frequency, the new modes of attack, the government allowing it to happen, the government taking an active role. When the government actually did ban ISIS, it really was nothing more than just a political statement. The ISIS supporters are free to solicit for funds. They're openly active in Indonesia. So, I mean, you know, you can't say that if you take a look at the record today, what's before you or what was before the board and you take a look at the record that was before the IJ, you're going to see that they're very qualitatively different from one another. Not just the same time, but it's the again, the intensity, the frequency, the fact that the government is allowing it to happen. The fact that even in the religious freedom reports, the 60 year old Christian lady that for the first time was chained in Indonesia on Sharia or Muslim law, not civil law. And Indonesia always touts itself as being a secular nation. And it's not. It's clearly not. Your time has expired. I'll give you one minute for rebuttal, but I think we should hear from you.  Mr. Bielert, you may proceed. Thank you. Good morning. May it please the court. My name is Jeff Bielert. I'm here on behalf of the Attorney General. In this case, the board properly denied the motion to reopen. And the reason, Judge Bielert, when you asked about the standard of review, it is abuse of discretion. But in the Singh v. INS case, this is cited on page 15 of our brief. When you're reviewing a denial for a motion to reopen, you may only do so if it was arbitrary, irrational, or contrary to law. And you're absolutely correct. The motion to reopen below cited the Saleem case, but I didn't see it mentioned in the BIA's ruling in this case. Did they just ignore it? Should we send it back to find out why they think it's distinguishable? In Saleem, Your Honor, there was a showing of individualized risk of harm. And so here, in this case, you don't have that. I don't think that you need to remand for the board to articulate why this case is different from Saleem. I think that the board properly looked at the evidence. A lot of the evidence that was submitted in support of the motion to reopen, if you look at the record that was before the immigration judge, and it was before the BIA, and then actually before this court in 2016, when Judges Berzon and Owens were presiding, they concluded that the petitioner had failed to show sufficient individualized risk of future persecution. And so two years later, when the motion to reopen was filed, nothing has changed. There's no showing of that individualized risk, so I don't think that you'd have to remand the board. Counsel, your friend on the other side said that in certain situations, the showing of individualized risk is minimized. And I think the case law at least supports that theory. Why isn't that the case here, where there is evidence of religious persecution? So, Your Honor, in one of the cases that was mentioned, the Robogo case, I'm not sure I'm pronouncing that correctly, but the order that was submitted with the 28-J letter, the board specifically said that there was extensive evidence. And this goes to, I think it was letters by family members or things like that. When you look at the letters in this case, the family members are just talking about generalized conditions in Indonesia, and there's no evidence to suggest that they were attacked or that any of these jihadi groups are actually specifically targeting this family, this particular family. I'm curious, would the government ever concede? Could generalized conditions be so bad that it was self-evident? Maybe, Your Honor. I mean, I don't think that that's this case. I mean, the law requires a showing of individualized risk. And to reopen, there must be material change. These are things that are required. So I'm not sure that I would concede necessarily that you could have such terrible circumstances. It seems in that case, you still have to put forward something alleging that there's an individualized risk if they were to return. And here you don't have that. And so, you know, the immigration judge held nine hearings in this case. If you look at the record, the things that were alleged below, it's some of the same sorts of instances. Terrorism and attacks on Christians in Indonesia has occurred. It occurred when Mr. Theodore was still in Indonesia. The last attack that he alleges was in 2001. He remained in the country for five years after that. He didn't leave to go to the United States until 2006. And frankly, when you look at the sorts of things that he alleges that ISIS is doing, it's some of the same sorts of activities that were already ongoing when this case was previously decided. There's some evidence of an increase. He submitted a 2012 report that said there's an upsurge in violence committed in the name of religion. A 2014 news article that said that increasingly Indonesia has become the scene of attacks for episodes of intolerance against other minorities, whether they're Christians or Ahmadis. So there was some showing that it got worse. Yes, Your Honor. And so if you look at the Saleem case, for example, then you could, you still have, you can have the finding that circumstances have changed. But in Saleem, the court made clear that you still have to have an individualized showing of harm, a risk of harm. And that's what makes this case different. As an appearance letter and the fear that they express in that letter is sufficient. It's too generalized, Your Honor. There's been no evidence submitted that Mr. Theodore himself would be a target of attacks or any member of his family who continue to live in Indonesia. A lot of it is just generalized very similar to the articles that he submitted. That's not sufficient evidence of an individualized risk of harm here. And on the cases that the court has granted, or excuse me, the board has granted a motion to reopen, those were qualitatively different. The sorts of evidence that was submitted in those cases actually did demonstrate, in one of the cases it was an attack on the family's church itself. It was a church that they attended. The family in Indonesia had been attacked. Those are the sorts of things that are required to establish that individualized risk of harm. And here we don't have that. So without that, the board did not abuse its broad discretion when it denied the motion to reopen. It was an untimely motion in this case that was submitted five years after the board originally made its decision. Mr. Bieler, it seems that what you're arguing is that there has to be some showing that the man or the man's family has been targeted by the terrorists to show individualized risk. If a bachelor were to come to the United States, he would never be able to show what you require. I guess he would have to have some evidence, Your Honor. But suppose all his family had died and he was living in the United States and he's a bachelor. He would never be able to show the change as to him, right? Perhaps so, Your Honor. Here, that's not the case. We have his family members that are still in Indonesia. And all of this was litigated. All of this was brought up in earlier litigation. It was before this court. All of the sorts of allegations that he's making now were litigated and were heard. And this court found that he failed to have a sufficient showing of individualized risk of harm. And frankly, the court was right. It was right then and it should hold the same, again, that the board did not abuse its broad discretion when it denied the motion to review. And unless the court has further questions, we ask that you deny the petition for review. All right. Thank you, counsel. Mr. Hardy, I'll give you one minute. Thank you, Your Honor. Again, the IJ recounts all the incidents of harm on administrative record 212 to 215. These are harms that the petitioner himself has experienced. He doesn't need to, you know, this notion of individualized risk is the risk of the member as opposed to the public, the general public. Not as opposed to other members within the same group. So here, Mr. Theodore has met the individualized risk showing given the new backdrop of what's happening in Indonesia. And for this reason, Your Honor, we would ask that the court grant his petition and send it back to the board. All right. Thank you, counsel. The case just argued will be submitted. Thank you, Your Honors.
judges: Bea, Thapar, Collins